UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

RAIQUAN FALLS.,

                             Plaintiff,                         **DECISION AND ORDER**

     -against-                                     17-cv-35 (AEK)

SERGEANT E. CAMPBELL #143, *et al.*,

                            Defendants.
-------------------------------------------------------------------X

**THE HONORABLE ANDREW E. KRAUSE, U.S.M.J.**[1]

Plaintiff Raiquan K. Falls ("Plaintiff"), proceeding *pro se*, brings this action against

Defendants Sergeant E. Campbell # 143 ("Sgt. Campbell"), Correction Officer A. Pullen # 124

("C.O. Pullen"), Correction Officer Goodenough # 392 ("C.O. Goodenough"), Correction

Officer Cardwell # 147 ("C.O. Cardwell"), and Lieutenant Penney ("Lt. Penney") (collectively,

"Defendants"), asserting claims under 42 U.S.C. § 1983 for both the use of excessive force and

conspiracy to deprive Plaintiff of his right to be free from the use of excessive force, both

allegedly in violation of the Eighth Amendment to the U.S. Constitution, and the denial of

procedural due process, allegedly in violation of the Fourteenth Amendment to the U.S.

Constitution.  ECF No. 76 (Third Amended Complaint).  Currently before the Court is

Defendants' motion for summary judgment (ECF No. 151).  For the reasons that follow,

Defendants' motion is GRANTED, and the case is dismissed.

---

[1] The parties originally consented to the jurisdiction of Magistrate Judge Lisa Margaret
Smith for all purposes pursuant to 28 U.S.C. § 636(c) on April 30, 2020.  ECF No. 120.  On
October 15, 2020, this case was reassigned to the undersigned.

I.      **BACKGROUND**

A.      **Procedural History**

Plaintiff commenced this action by filing a complaint on January 3, 2017.  ECF No. 2. Following a lengthy history of motion practice and the filing of multiple amended complaints, Defendants' motion to dismiss Plaintiff's Third Amended Complaint was denied, ECF No. 99, Defendants filed their Answer, ECF No. 103, and the parties engaged in discovery.  During the course of discovery, Plaintiff was released from state custody; this led to delays in the completion of the discovery phase of this matter.  *See* ECF Nos. 130-143.  After being informed by Defendants that discovery had been completed, the Court approved a briefing schedule for Defendants' motion for summary judgment.  *See* ECF No. 143.  In accordance with the schedule, Defendants' motion was to be filed on May 7, 2021; Plaintiff's opposition was to be filed on June 11, 2021; and Defendants' reply was to be filed on July 2, 2021.  *Id.*  As part of that scheduling order, Court noted that although it had issued "numerous warnings and requests," Plaintiff had still "not provided an updated address to the court."  *Id.*  The Court added that if Plaintiff did not yet have a permanent address, then he was to "officially provide an email address to the Court – to be included on the docket – where plaintiff can receive copies of orders and other information from the Court."  *Id.*  In conclusion, the Court warned Plaintiff that it would "not continue to require counsel for [D]efendants to serve court documents; if Plaintiff does not update his mailing address and/or his email address, he may not receive copies of future orders or communications from the Court."  *Id.*

Defendants served and filed their motion for summary judgment on May 7, 2021.  ECF No. 151-159; *see also* ECF No. 160 (certificate of service of motion and all supporting documents on Plaintiff at his last known address).  Plaintiff did not file any opposition papers,

but pursuant to the briefing schedule, Defendants still filed a reply submission on July 2, 2021. ECF No. 163; *see also* ECF No. 164 (certificate of service of reply submission on Plaintiff at his last known address).

On July 6, 2021, the Court issued an order indicating that the motion for summary judgment was fully submitted and would be deemed unopposed "unless Plaintiff either serves and files his opposition papers, or seeks an extension of time in which to do so, **by no later than July 20, 2021**." ECF No. 165 (emphasis in original). The Court further noted that Plaintiff had "still failed to provide the Court with his updated contact information," adding that "Plaintiff is directed once again that he must do so and that **any failure to do so might result in the Court dismissing his case for failure to prosecute**." *Id.* (emphasis in original); *see also* ECF No. 166 (certificate of service of Court's July 6, 2021 Order on Plaintiff at his last known address).

To date, Plaintiff has neither filed an opposition to Defendants' motion for summary judgment nor asked the Court for an extension of time in which to do so. In a letter dated March 11, 2022, Plaintiff informed the Court that he was "reincarcerated at the Orange County Jail[2]" and provided the Court with his address at the jail. ECF No. 167. This submission stated that Plaintiff had been at the Orange County Jail since February 19, 2022, and was due to be released on March 18, 2022, at which time he would provide the Court with a new address.[3] *Id.* Although Plaintiff asked in his March 11, 2022 communication that "[i]f any motions or orders

---

[2] Plaintiff refers to this facility as the "Orange County Jail" in his March 11, 2022 letter, and the Court therefore uses that name for the institution here. Defendants, in their summary judgment submissions, refer to this same location as the Orange County Correctional Facility, and the Court adopts that name in other parts of this Decision and Order. To be clear, the "Orange County Jail" and the "Orange County Correctional Facility" referenced herein are two different names for the same correctional institution, which is located in Goshen, New York.

[3] As of the date of this Decision and Order—March 30, 2022—there is no record of Plaintiff having provided the Court with a new address. Plaintiff's address of record on the docket is his Orange County Jail address.

were filed and previously sent to my previous address location . . . please wait until I provide the

Court with a new address, then re-send those documents to me," *id.*, the motion papers in this

case were served on Plaintiff almost a full year ago, long before he arrived at the Orange County

Jail on February 19, 2022.  It is not necessary for Plaintiff to be served with another copy of

these motion papers at this late date, based on this extremely belated and ambiguous request.

Notably, the address at which Plaintiff was served with Defendants' summary judgment

filings—11 Liberty Street in Newburgh, New York, *see* ECF Nos. 160, 164—is the same address

(11 Liberty Street) that Plaintiff refers to in his March 11, 2022 letter as his "previous address

location" prior to his reincarceration at the Orange County Jail, *see* ECF No. 167 at 2.[4]  If

Plaintiff did not receive Defendants' summary judgment submissions—and the Court has no

reason to believe that he did not—it was due to his own failure to apprise the Court and

Defendants' counsel of his updated contact information, as he was obligated to do and as he was

repeatedly advised to do.

## B.      Factual Background

The details of the events giving rise to Plaintiff's claims are not directly relevant to the

grounds for the Court's grant of summary judgment as set forth herein.  The Court nonetheless

provides a brief recitation of the facts, which are undisputed unless otherwise noted, as taken

from Defendants' Local Civil Rule 56.1 Statement ("Defs.' 56.1"), ECF No. 158, and the

evidence submitted by Defendants in connection with the motion.

---

[4] Plaintiff's address of record on the ECF docket at the time Defendants' summary judgment motion and reply submission were served was the Wende Correctional Facility, a prison in the New York State Department of Corrections and Community Supervision ("DOCCS") system, even though Plaintiff had been released from prison approximately seven months earlier.  *See* ECF Nos. 130, 132.  Nevertheless, based on communications between Plaintiff and counsel for Defendants, the summary judgment papers and other Court orders were served on Plaintiff at his 11 Liberty Street address.  *See* ECF Nos. 145, 160, 164, 166.

Plaintiff was remanded to the custody of the Orange County Sheriff's Office and entered the Orange County Correctional Facility ("OCCF") on September 29, 2015. Defs.' 56.1 ¶ 1; ECF No. 155 ("Campbell Aff.") ¶ 10. From July 4, 2016 to August 31, 2016, Plaintiff was housed in "D1," the disciplinary housing unit at OCCF. Defs.' 56.1 ¶ 5. On August 31, 2016, Plaintiff was transferred to the custody of the Mid-Hudson Forensic Psychiatric Center pursuant to court order, and was transferred back to OCCF on November 1, 2016, at which time, he was returned to the D1 housing unit. *Id.* ¶¶ 6-7. Plaintiff was transferred from OCCF's D1 housing unit to the facility's general population—the D2 housing unit—on November 29, 2016, and stayed there until March 1, 2017. *Id.* ¶ 8. On March 3, 2017, Plaintiff was transferred to the custody of DOCCS. *Id.* ¶ 9; *see* ECF No. 152 ("Lagitch Decl.") Ex. F ("Pl. Depo. Tr.") at 8: 9-13.

On the evening of July 4, 2016, Sgt. Campbell went to the D1 housing unit to deliver dinner trays to the inmates, Defs.' 56.1 ¶ 18, and upon his arrival, he ordered Plaintiff and three other inmates to kneel on their beds, facing the wall, while he delivered the trays, *id.* ¶ 22. Plaintiff refused to comply—he believed that it was "dehumanizing and degrading"—and he consequently did not receive a dinner tray. *Id.* ¶ 23. After Sgt. Campbell left the D1 housing unit, Plaintiff asked Correction Officer Oriani ("C.O. Oriani"), the assigned housing unit officer, if he could get Plaintiff a dinner tray, but C.O. Oriani said that it was for Sgt. Campbell to decide. *Id.* ¶ 25. Plaintiff asked C.O. Oriani to call the mental health unit on his behalf "or something is going to happen"; Plaintiff believed that the mental health unit would convince Sgt. Campbell to give him his dinner tray. *Id.* ¶ 26. Plaintiff purposely told C.O. Oriani that he was thinking of taking his own life in order to convince him to call the mental health unit. *Id.* ¶ 28; *see* Pl. Depo. Tr. at 80:13-20 ("I said I'm thinking about taking my life if I don't get my food.").

5

After completing his rounds, C.O. Oriani returned to Plaintiff's cell and saw him slumped over on his cell floor "with what appeared to be his t-shirt tied around his neck." Lagitch Decl. Ex. L ("Oriani Report"); Defs.' 56.1 ¶ 29.  When C.O. Oriani tried to talk to Plaintiff, Plaintiff was unresponsive; this prompted C.O. Oriani to make a radio transmission to the effect that there was an inmate in the D1 housing unit trying to "hang up." *Id.* ¶ 31.  Plaintiff maintains that the officers' statements that he tried to "hang up," *i.e.*, commit suicide, were lies. *See* Lagitch Decl. Ex. H (excerpts of Plaintiff's OCCF "discipline file") at Bates number 000082.

OCCF's Emergency Response Team ("ERT"), which included Defendants Sgt. Campbell and C.O.s Pullen, Goodenough, and Cardwell, responded to C.O. Oriani's radio transmission. *Id.* ¶ 32.  C.O. Pullen, C.O. Goodenough, and C.O. Cardwell entered Plaintiff's cell and physically subdued him.. *See* Campbell Aff. ¶¶ 5-6 (C.O. Pullen took Plaintiff to the ground and placed him in the prone position; C.O. Goodenough helped C.O. Pullen place Plaintiff in hand restraints while C.O. Cardwell secured Plaintiff's legs in temporary leg restraints); Oriani Report; Defs.' 56.1 ¶¶ 33-37.  Plaintiff testified at his deposition that when C.O. Pullen entered his cell, he tackled Plaintiff, crashed him into the wall, and "body slammed" him to the floor on his face.  Pl. Depo. Tr. at 92:4-93:12.  He stated that C.O. Pullen then thrust his knee into Plaintiff's back "as hard as he could." *Id.* at 97: 19-23.  Plaintiff added that C.O. Goodenough punched him in his ribs, and C.O.s Goodenough and Cardwell kneed Plaintiff in his sides and struck him in the ribs. *Id.* at 98:11-100:2.  Plaintiff further testified that Sgt. Campbell then entered his cell and administered Plaintiff one punch and one kick in the face. *Id.* at 101:18-102:8.

## II.    DISCUSSION

### A.    Standard for Summary Judgment

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 320-23 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, a court should "constru[e] the evidence in the light most favorable to the nonmoving party and draw[] all reasonable inferences in its favor." *Mount Vernon Fire Ins. Co. v. Belize NY, Inc.*, 277 F.3d 232, 236 (2d Cir. 2002); *Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 97 (2d Cir. 2001); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 764 (2d Cir. 1998); *see also Anderson*, 477 U.S. at 261 n.2. Thus, "[o]nly when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted." *Cruden v. Bank of New York*, 957 F.2d 961, 975 (2d Cir. 1992) (quoting *H.L. Hayden Co. v. Siemens Med. Sys. Inc.*, 879 F.2d 1005, 1011 (2d Cir. 1989)).

In cases involving *pro se* litigants, on a motion for summary judgment, the court reads the pleadings "liberally and interpret[s] them to raise the strongest arguments that they suggest." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003) (quotation marks omitted). Nonetheless, "application of this different standard does not relieve [the *pro se* party] of his [or her] duty to meet the requirements necessary to defeat a motion for summary judgment." *Id.* (quotation marks omitted). Where *pro se* parties do not adhere to Local Civil Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New

York, and that rule's requirements concerning statements of undisputed facts, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules . . . [and] it may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citations and quotation marks omitted). "Courts in this Circuit typically forgive a *pro se* plaintiff's failure to file a Local [Civil] Rule 56.1 Statement, and generally conduct their own independent review of the record." *Lloyd v. Holder*, No. 11-cv-3154 (AT), 2013 WL 6667531, at *5 (S.D.N.Y. Dec. 17, 2013)[5]; *see Hayes v. Cnty. of Sullivan*, 853 F. Supp. 2d 400, 406 n.1 (S.D.N.Y. 2012). The Court has done so here.

Moreover, where, as here, a *pro se* litigant has failed altogether to oppose a motion for summary judgment, the Second Circuit has held that "summary judgment should not be entered by default against a *pro se* plaintiff who has not been given any notice that failure to respond will be deemed a default." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). However, "an easily comprehensible notice from the party moving for summary judgment would suffice." *Id.* In this case, Defendants served Plaintiff with a notice pursuant to Local Civil Rule 56.2 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, which included copies of the full text of both Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York. ECF No. 161; *see also* ECF No. 162 (certificate of service of Amended Local Civil Rule 56.2 Notice to Pro Se Litigant Opposing Summary

---

[5] In accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) and Local Civil Rule 7.2 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, copies of this case and other cases that are unpublished or only available by electronic database are being simultaneously mailed to the *pro se* Plaintiff along with this Decision and Order.

Judgment on Plaintiff at his last known address). This notice also informed Plaintiff that a failure to respond to the motion might result in a dismissal of his claims without a trial; that he could not oppose the motion simply by relying on the allegations in his complaint, but rather, had to submit evidence; and that if he failed to do so, the Court might accept Defendants' factual assertions as true, and judgment might then be entered in Defendants' favor without a trial. ECF No. 161.[6] Accordingly, Plaintiff was adequately notified of the potential consequences of his failure to respond to Defendants' motion for summary judgment. *See, e.g.*, *Blackwood v. Omorvan*, No. 16-cv-644 (NSR), 2019 WL 4600662, at *3 (S.D.N.Y. Sept. 23, 2019); *Diggs v. Volpe*, No. 11-cv-6382 (KPF), 2013 WL 4015758, at *6-7 (S.D.N.Y. Aug. 7, 2013).

"The fact that there has been no response to a summary judgment motion does not, of course, mean that the motion is to be granted automatically." *Champion*, 76 F.3d at 486. Rather, as noted above, a motion for summary judgment "may properly be granted only if the facts as to which there is no genuine dispute show that the moving party is entitled to a judgment as a matter of law." *Id.* (quotation marks omitted).

B. **Excessive Force—Failure to Exhaust Under the PLRA**

1. **Legal Standards**

Pursuant to the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has held

---

[6] Defendants' original Local Civil Rule 56.2 Notice to Pro Se Litigant Opposing Summary Judgment was deficient, because it did not include a copy of Local Civil Rule 56.1. *See* ECF No. 159. On June 30, 2021, Defendants served and filed an Amended Local Civil Rule 56.2 Notice to Pro Se Litigant Opposing Summary Judgment, which did include a copy of Local Civil Rule 56.1. *See* ECF Nos. 161-162.

that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).  Moreover, "[e]ven when the prisoner seeks relief not available in grievance proceedings, notably money damages, exhaustion is a prerequisite to suit." *Id.* at 524.  "[T]o properly exhaust administrative remedies prisoners must complete the administrative review process in accordance with the applicable procedural rules—rules that are defined not by the PLRA, but by the prison grievance process itself." *Jones v. Bock*, 549 U.S. 199, 218 (2007) (internal citation and quotation marks omitted).  "Adherence to the exhaustion requirement means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." *Gunn v. Ayala*, No. 20-cv-840 (KMK), 2021 WL 5647795, at *5 (S.D.N.Y. Dec. 1, 2021) (quotation marks omitted) (emphasis in original).  "Said more plainly, the PLRA demands strict compliance with the grievance procedure, or else dismissal must follow inexorably." *Id.* (quotation marks and alteration omitted).

"However, prisoners are exempt from the exhaustion requirement when administrative remedies are 'unavailable.'" *Stewart v. Suffolk Cnty. Sheriff's Off.*, 792 F. App'x 136, 138 (2d Cir. 2020) (summary order) (citing *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016)).  "An administrative procedure may be unavailable when (1) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates; (2) it is so opaque that it becomes, practically speaking, incapable of use; or (3) when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* (quotation marks omitted).

"Because failure to exhaust [administrative remedies under the PLRA] is an affirmative defense, defendants bear the initial burden of establishing, by pointing to legally sufficient sources such as statutes, regulations, or grievance procedures, that a grievance process exists and applies to the underlying dispute." *Hubbs v. Suffolk Cnty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015) (internal quotation marks, citations, and alteration omitted).  If the defendants meet their initial burden, the burden shifts to the plaintiff to "demonstrate that other factors . . . rendered a nominally available procedure unavailable as a matter of fact." *Id.*

### 2.      Plaintiff Failed to Exhaust His Administrative Remedies

Defendants have provided evidence establishing that a grievance procedure existed at OCCF at the time of the events at issue in this lawsuit.  *See* Defs.' 56.1 ¶¶ 151-52, 155-57; Lagitch Decl. Ex. X ("OCCF Inmate Handbook") & Ex. Y ("OCCF Grievance Policy"); *see also* 9 N.Y.C.R.R. § 7032.4 (regulation setting forth the requirements for a county correctional facility's grievance program).  The grievance procedure applies to Plaintiff's excessive force claim based on the July 4, 2016 incident.  *See Porter* 534 U.S. at 532; Inmate Handbook at 30[7] (defining a grievance as a written complaint concerning, among other things, "the action or inaction of any employee of the Facility"); Grievance Policy at 1[8] (discussing types of grievances, including those involving "staff action, inaction or non-adherence to existing procedures").

OCCF's Inmate Handbook sets forth the facility's grievance procedure.  In Paragraph 1 of the section of the Handbook titled "Grievance Procedure," a grievance is defined as "a written

---

[7] Citations to the Inmate Handbook are to the pages of the Handbook included in the excerpt provided as Exhibit X of the Lagitch Declaration.

[8] Citations to the Grievance Policy are to the pages of OCCF's 2017 Policy & Procedure Manual provided as Exhibit Y of the Lagitch Declaration.

inmate complaint concerning written or unwritten facility policies, procedures, rules, practices, programs or the action or inaction of any employee of the Facility."  Inmate Handbook at 30. The Inmate Handbook notes that OCCF's "Grievance Coordinator will administer the grievance process," and "shall act as a liaison between the grievant, the Chief Administrative Officer [of OCCF] and the New York State Commission of Corrections in all matters that pertain to the inmate grievance."  *Id.*  Paragraph 2 of the Grievance Procedure section of the Handbook lists the "[i]nstructions and procedures for resolving problems and filing grievances . . . [i]f you have a complaint or problem," as follows:

a.  Attempt to resolve the problem with the Officer assigned to your Housing Unit or the Housing Unit Supervisor.

b.  If for some reason you and the Officer or the Supervisor are unable to reach an acceptable resolution, you may request and will receive a grievance form by the end of the shift, but no longer than eight (8) hours of [*sic*] your request.

c.  Your grievance request must be submitted within five days of the incident.

d.  You may request and will receive assistance in filling out the form.

e.  The Chief Administrative Officer or his/her designee shall ensure that each grievance is investigated to the fullest extent necessary by an impartial person who was not personally involved in the circumstances giving rise to the grievance.  A grievance that is too vague to understand or fails to set forth supporting evidence or information will be returned to the inmate.  Failure to supply sufficient information or evidence within two (2) days shall be cause to deny the grievance.

f.  If you are not satisfied with the Grievance Coordinators [*sic*] decision, you may appeal the determination to the Corrections Administrator within two business days of receiving the decision.

g.  You will receive a response within five (5) business days.

h.  Grievances regarding dispositions or sanctions from the disciplinary hearings, administrative segregation housing decisions, issues that are outside the authority of the Chief Administrative Officer to control, or

complaints pertaining to another inmate are not grievable and will be
returned to the inmate by the Grievance Coordinator.

Inmate Handbook at 30-31.  The Grievance Procedure further provides in paragraph 3 that

"[t]here is a Grievance Box on each Housing Unit which is checked each business day.

Grievances or other written complaints may be placed in the box by any inmate." *Id.* at 31.

Paragraph 4 of the Grievance Procedure describes the procedure for pursuing an appeal of the

denial of an inmate's grievance by the Corrections Administrator. *Id.*

At his deposition, Plaintiff testified that he received a copy of the "Inmate Rulebook,"

which contained the grievance procedure, upon his arrival at OCCF in September 2015.  Pl.

Depo. Tr. at 222:25-223:11; *see* Lagitch Decl. Ex. W (Inmate Orientation checklist); Lagitch

Decl. Ex. X[9]; ECF No. 154 ("Kiszka Decl."[10]) ¶¶ 5-6 (describing document first as the "inmate

handbook/rulebook" and later as the "Inmate Handbook").  Plaintiff acknowledged that he had

been incarcerated at OCCF prior to his September 2015 admission, was familiar with the

grievance process, and had filed grievances at OCCF both before and after the July 4, 2016

incident.  *See* Pl. Depo. Tr. at 220: 6-24; 223: 7-18; 225:18-228:4.  Indeed, records maintained

by the OCCF Grievance Coordinator indicate that Plaintiff was issued a grievance form on 14

occasions during the period from March 2016 to March 2017; on nine occasions, the grievance

forms were issued because of complaints about staff, and on nine of the occasions where

grievance forms were issued to Plaintiff, he was housed in the same D1 housing unit where he

---

[9] Although the document at Lagitch Decl. Ex. X is labeled Inmate Handbook, and the
Court has referred to that document as the Inmate Handbook, Defendants also interchangeably
refer to Exhibit X of the Lagitch Declaration as the "Inmate Rulebook" that is referenced on the
Inmate Orientation checklist and that was the subject of this deposition testimony.  *See* Defs.'
56.1 ¶¶ 151-52.

[10] Lieutenant Keith Kiszka was the Grievance Coordinator at OCCF from June 2016 to
February 2021.  Kiszka Decl. ¶ 1.

was housed on July 4, 2016. Kiszka Decl. ¶ 14. While OCCF records reveal that Plaintiff did

not turn in most of these grievance forms to the Grievance Coordinator, *id.*, Plaintiff did file and

pursue two grievances while in custody at OCCF—one in March 2016, and the other in

November 2016. Lagitch Decl. Ex. AA (Plaintiff's "grievance file" from OCCF) (Bates range

001123-001147). In short, there is no question that Plaintiff was familiar with the grievance

process at OCCF, and that he availed himself of that process on multiple occasions during his

time in custody there. Plaintiff conceded, however, that he never filed a grievance in connection

with the incident on July 4, 2016. Pl. Depo. Tr. at 228:5-9; *see* Kiszka Decl. ¶ 3.

Plaintiff alleges in his Third Amended Complaint, and testified during his deposition, that

he was denied a grievance form for the purpose of grieving the July 4, 2016 use of force. *See*

Third Am. Compl. ¶¶ 60-61, 63; Pl. Depo. Tr. at 228:21-230:25, 234:21-235:2; *see also* Video

No. 4[11] at 4:09-4:46 (Plaintiff's testimony from his July 8, 2016 disciplinary hearing[12]). Even if

this were true, Plaintiff himself acknowledged, and case law makes clear, that "a denial of

grievance forms does not, in itself, make administrative remedies unavailable." *Gottesfeld v.*

---

[11] Defendants submitted eight videos as evidence in support of their motion. *See* Lagitch
Decl. ¶¶ 33-40.

[12] Plaintiff testified at this disciplinary hearing that he asked for a grievance form for the
July 4, 2016 incident, but that Sergeant Figueroa refused to give him one. In contrast, during his
deposition, Plaintiff testified that he asked Sergeant Hernandez for a grievance form, and that he
also asked the officers who were "doing my suicide watch . . . supervising me" for the form. Pl.
Depo. Tr. at 228:21-229:7. According to Plaintiff's deposition testimony, he asked Sergeant
Hernandez for a grievance form "[p]robably one time" and asked the other officers for the form
"only one time"; Plaintiff explained that he was subject to a deprivation order at that time, and he
assumed that OCCF staff would not provide him with a grievance form while he was subject to
that order. *Id.* at 229:22-230:18. Plaintiff also testified that these other officers "are the same
officers I would ask for sick call slips or certain things and they would deny me because I'm on
suicide watch or because I'm on depravation [*sic*] order." *Id.* at 229:10-14. But this testimony is
contradicted by evidence in the record that Plaintiff was provided with "sick call slips" on July 7,
2016—even while subject to the deprivation order—and that he completed those forms. *See*
Lagitch Decl. Ex. T (Plaintiff's OCCF medical records) (Bates range 000356-000357).

*Anderson*, No. 18-cv-10836 (PGG), 2020 WL 1082590, at *8 (S.D.N.Y. Mar. 6, 2020)

(quotation marks omitted) (collecting cases); *see* Pl. Depo. Tr. at 235:4-24 ("They knew that I

don't need a grievance form.  See, you can file your grievance on a regular piece of paper.  So I

don't have to ask for a grievance form . . . .").  And here, video evidence provided by Defendants

shows that Plaintiff was, in fact, provided a grievance form during his July 8, 2016 disciplinary

hearing.  Video No. 4 at 5:38, 7:13-7:17; *see* ECF No. 153 ("Banse Aff."[13]) ¶¶ 11-13 ("During

the course of the hearing, plaintiff spoke to us about the July 4, 2016 incident in which force was

used against him and complained about his inability to obtain a grievance form in connection

with the incident from Sgt. Figueroa.  As a result, I personally obtained a grievance form for him

and gave it to him during the July 8, 2016 hearing.  Notably, plaintiff verbally confirms receipt

of the grievance on the hearing video.").

Plaintiff also alleges in his Third Amended Complaint, and testified during his

deposition, that he could not file a grievance for the July 4, 2016 incident because he was denied

access to regular paper and a pen.  *See* Third Am. Compl. ¶¶ 60-61, 63; Pl. Depo. Tr. at 203: 16-

18, 212: 8-17, 225: 4-7, 235: 9-24.  Evidence in the record establishes, however, that at various

times during the five-day window for filing a grievance regarding the July 4, 2016 incident,

Plaintiff had access to both paper and a pen.  For example, Plaintiff had access to paper and a

pen when he completed a document titled "Inmate Discipline Absentia Hearing" on July 6, 2016.

Lagitch Decl. Ex. H (Bates number 000082); Pl. Depo. Tr. at 198:7-199:7.  Plaintiff also had

access to paper and a pen when he filled out and signed two healthcare request forms on July 7,

2016.  Lagitch Decl. Ex. T (Bates range 000356-000357).  This demonstrates that Plaintiff "was

---

[13] Officer Kevin Banse has "served as an assistant to the Hearing Officer at disciplinary
hearings conducted at [OCCF]" since 2014.  Banse Aff. ¶ 2.

not deprived of writing materials and could have filed a grievance." *Lahoz v. Orange Cnty. Jail*, No. 08-cv-4364 (RWS), 2010 WL 1789907, at *3 (S.D.N.Y. Apr. 29, 2010) (plaintiff's handwritten letter within the period allowed for filing grievances demonstrated that he was not deprived of writing materials); *see Rodriguez v. Cross*, No. 15-cv-1079 (GTS) (CFH), 2017 WL 2791063, at *5 (N.D.N.Y. May 9, 2017) ("When an inmate argues that a correction officer denies him [or her] access to pen or paper, even assuming the allegations are true, courts examine whether the inmate was drafting other documents during the same time period, or whether they were able to access materials from other sources."), *adopted by* 2017 WL 2790530 (N.D.N.Y. June 27, 2017).[14]

Plaintiff also testified that he tried to grieve the July 4, 2016 use of force incident as part of the "Inmate Discipline Absentia Hearing" document that he submitted on July 6, 2016.  Pl. Depo. Tr. at 228:8-20.  Indeed, that document states: "I want a grievance on the [July 4] incident where Sergent [*sic*] Campbell went inside my cell & kicked me in my face & the rest of the [Emergency Response Team] that kneed me in my back & caused serious injury."  Lagitch Decl.

---

[14] There is also video evidence from July 8, 2016 of Plaintiff holding in his hands the grievance form and other forms from his disciplinary hearing that morning, and of Plaintiff being told by Sergeant Hernandez, upon arrival back at his cell, that he would be allowed to have a pen.  Video No. 5 at 00:01-00:15 (leaving the disciplinary hearing with papers in his hands), 17:25 (being handed back his papers after a medical appointment), 23:24 (being told "I'll leave you the grievance" by Sergeant Hernandez), 26:34 & 27:18 (being told by Sergeant Hernandez that he could have a pen), 28:35 (papers being taken out of Plaintiff's hands and placed in the cell).  But the video evidence further shows that after being escorted back to his cell, Plaintiff refused to enter, and was ultimately taken back to the medical unit and transported to the hospital by ambulance.  *See* Video Nos. 5-7; Lagitch Decl. Ex. R (July 8, 2016 incident report).  Plaintiff did not return to OCCF until July 9, 2016.  Lagitch Decl. Ex. S (July 9, 2016 report).  There is no additional video evidence regarding whether Plaintiff was able to access the grievance form, any other paper, or a pen within the remainder of the five-day period allowed for filing his grievance of the July 4, 2016 incident.  Nonetheless, the evidence of Plaintiff's access to paper and a pen on July 6 and July 7, as set forth above, suffices to establish that Plaintiff was not prevented from filing a grievance on this basis.

Ex. H at Bates number 000082.  But a prisoner must procedurally exhaust his or her claims by "'compl[ying] with the system's critical procedural rules . . . .'"  *Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007) (quoting *Woodford v. Ngo*, 548 U.S. 81, 95 (2006)).  Taking informal steps to put prison officials on notice of a prisoner's claims is insufficient—"[a]lerting the prison officials as to the nature of the wrong for which redress is sought . . . does not constitute proper exhaustion under *Woodford*."  *Id.* at 44 (internal citation, quotation marks, and alterations omitted). Submission of the "Inmate Discipline Absentia Hearing" document to Officer Banse as part of his disciplinary hearing process, *see* Banse Aff. ¶ 8, rather than through the specific mechanisms prescribed in the Grievance Procedure, did not serve to exhaust Plaintiff's administrative remedies for Plaintiff's claim concerning the July 4, 2016 use of force.  *Gunn*, 2021 WL 5647795, at *5 ("the PLRA demands strict compliance with the grievance procedure, or else dismissal must follow inexorably").

Finally, Plaintiff testified that he could not access the grievance mailbox in the D1 housing unit himself, and that he would have had to give his grievance to an officer to put it in the mailbox for him.  Pl. Depo. Tr. at 222:3-24.  Plaintiff explained that "[i]f you're not on good terms with the officer, you might as well say forget it.  Because I would be giving my grievance—the same officer I'm complaining about is buddies with the same officer I'm giving it to."  *Id.* at 222: 10-15.  But the two grievances that Plaintiff filed and pursued while he was at OCCF were both filed while he was housed in the D1 housing unit.  Lagitch Decl. Ex. AA (Bates numbers 001124 and 001142); Kiszka Decl. ¶ 16.  Although the first of those grievances, submitted in March 2016, was classified as a grievance involving food services, Lagitch Decl. Ex. AA at Bates number 001123, it included allegations that one of the sergeants had threatened that he would make Plaintiff's life "a living hell" if he filed the grievance, causing Plaintiff to

"fear the worst will happen to me," *id.* at Bates number 001124.  The second of those grievances,

submitted in November 2016, involved a complaint against staff for misplacing Plaintiff's

personal property.  *Id.* at Bates numbers 001142, 001144.  Accordingly, Plaintiff's conclusory

assertion fails to establish that being housed in the D1 housing unit or lodging a complaint

against corrections officers prevented him from filing a grievance regarding the July 4, 2016

incident.  *See* Kiszka Decl. ¶ 17 ("I can likewise attest that during the five days following the

July 4, 2016 incident other D1 inmates were issued grievances by various sergeants working the

D1 unit, including grievances concerning staff, and that grievances were collected from the D1

grievance box as well."); Lagitch Decl. Ex. Z (Grievance Logbook).

   In sum, Defendants have satisfied their burden of establishing that a grievance procedure

existed at OCCF at the time of the events at issue in this lawsuit, and that the OCCF grievance

procedure applied to Plaintiff's excessive force claim.  This shifts the burden to Plaintiff to

demonstrate that the grievance procedure was unavailable to him, *Hubbs*, 788 F.3d at 59, and

Plaintiff has failed to make the necessary showing.  Based upon this Court's thorough and

independent review of the record, there is no evidence, other than Plaintiff's self-serving

statements, to demonstrate that OCCF's grievance procedure was unavailable to Plaintiff in

connection with the July 4, 2016 incident, and such self-serving statements are not enough to

defeat Defendants' motion.  *See*, *e.g.*, *Deebs v. Alstom Transp., Inc.*, 346 F. App'x 654, 656 (2d

Cir. 2009) (summary order) (self-serving deposition testimony alone is insufficient to overcome

summary judgment); *Walton v. Lee*, No. 15-cv-3080 (PGG), 2019 WL 1437912, at *8 (S.D.N.Y.

Mar. 29, 2019) (same).  Plaintiff was familiar with the OCCF grievance procedure, knew how to

file grievances in accordance with that procedure, and had pursued certain grievances using that

procedure.  Further, the various explanations offered by Plaintiff for his admitted failure to file a

grievance regarding the July 4, 2016 incident are plainly contradicted by the evidence in the record. Accordingly, Defendants are entitled to summary judgment on Plaintiff's claim of excessive force based on Plaintiff's failure to exhaust administrative remedies.

### C.   Conspiracy to Deprive Plaintiff of His Right to be Free from the Use of Excessive Force

Although Defendants do not specifically argue in their motion papers that Plaintiff's claim for conspiracy to deprive Plaintiff of his right to be free from the use of excessive force should also be dismissed for failure to exhaust administrative remedies,[15] this defense is equally applicable to the conspiracy claim. *See, e.g.*, *Jones v. Fischer*, No. 07-cv-7589 (DC), 2008 WL 3174510, at *5 (S.D.N.Y. Aug. 7, 2008) ("Because plaintiff failed to exhaust his administrative remedies with respect to his complaints of . . . conspiracy to violate his civil rights . . . , each [claim] is dismissed against all defendants as a matter of law under the PLRA."); *Soto v. Belcher*, 339 F. Supp. 2d 592, 593, 596 (S.D.N.Y. 2004) (dismissing all of plaintiff's claims, including conspiracy claims under 42 U.S.C. § 1983, for failure to exhaust administrative remedies as required by the PLRA).

Accordingly, Defendants are entitled to summary judgment on Plaintiff's claim for conspiracy to deprive Plaintiff of his right to be free from the use of excessive force based on Plaintiff's failure to exhaust administrative remedies.

Moreover, because administrative remedies are no longer available to Plaintiff on these claims, both the excessive force claim and the conspiracy claim are dismissed with prejudice.

---

[15] In their Answer to the Third Amended Complaint, Defendants generally assert, as their eleventh affirmative defense, that "Plaintiff failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act." ECF No. 103 ¶ 80.

*See Soto*, 339 F. Supp. 2d at 596 ("Because any administrative remedies Soto may have had are now time-barred, this action is dismissed with prejudice.").

### D.    Procedural Due Process

Plaintiff's claim for violation of his right to procedural due process under the Fourteenth Amendment is asserted only against Lt. Penney.  *See* Third Am. Compl. ¶ 69.  Because Plaintiff failed to file or serve a motion for substitution following the properly filed statement providing notification of Lt. Penney's death—despite multiple warnings and directions from the Court of the requirement to take this step—Defendants' motion for summary judgment on this claim is also granted.

Rule 25 of the Federal Rules of Civil Procedure, which governs the substitution of parties, states that:

> If a party dies and the claim is not extinguished, the court may order substitution of the proper party.  A motion for substitution may be made by any party or by the decedent's successor or representative.  If the motion is not made within 90 days after service of a statement noting the death, the action by or against the decedent *must be dismissed*.

Fed. R. Civ. P. 25(a)(1) (emphasis added).

Rule 25 also states that:

> A motion to substitute, together with a notice of hearing, must be served on the parties as provided in Rule 5 and on nonparties as provided in Rule 4.  A statement noting death must be served in the same manner.  Service may be made in any judicial district.

Fed. R. Civ. P. 25(a)(3).

In a letter dated May 1, 2020, Defendants' counsel notified Plaintiff and the Court that Lt. Penney had passed away on April 11, 2020.  ECF No. 121.  During a telephonic status conference held on August 6, 2020, Defendants' counsel advised the Court and Plaintiff that Lt. Penney's spouse ("Mrs. Penney"), on behalf of the Estate of Lt. Penney, was the proper party to

be substituted into the case, and on August 11, 2020, the Court received a letter from Plaintiff

requesting that Mrs. Penney be substituted as a defendant in this matter.  ECF No. 125.

    In an order issued on August 21, 2020, the Court noted that Defendants' counsel had not

served a statement noting death in accordance with Rule 25, and therefore the 90-day period for

filing a motion for substitution had not yet been triggered.  ECF No. 126.  The order further

explained that the Court deemed Plaintiff's August 11, 2020 letter to be a motion for substitution

(even though the formal Rule 25 statement noting death had not been filed), but was denying

Plaintiff's motion because it had not been served on Mrs. Penney, as the representative of Lt.

Penney's estate, as required by Rule 25.  *Id.*  The Order made clear that the denial of Plaintiff's

motion for substitution was without prejudice, and that Plaintiff could renew the motion after

serving it on Mrs. Penney and filing of proof of such service with the Court.  *Id.*

    On August 31, 2020, Defendants' counsel filed a letter stating that her office would be

representing Mrs. Penney were the motion for substitution to be granted and that her office

would accept service of the motion for substitution on behalf of Mrs. Penney.  ECF No. 127.

The Court memo endorsed the August 31 letter, ordering that "Plaintiff shall prepare a motion to

substitute Kathleen Penney, as Executor of the Estate of Lt. Penney, in place of Lt. Penney . . .

[and] . . . shall serve the motion on [Defendants' counsel], then file the motion with the Court

along with a certificate of service."  ECF No. 129.

    The Court issued another order on March 15, 2021, which noted that Plaintiff had still not

renewed his motion for substitution, but added that "since Defendants' counsel never served a

statement noting death in accordance with Rule 25, the 90-day period for filing the substitution

motion has still not been triggered, and Plaintiff is therefore not barred from renewing his motion

for substitution even at this late date."  ECF No. 144.  The Court therefore ordered:

(1) Defendants' counsel must serve and file a statement noting death in accordance with Rule 25, *i.e.*, by serving it on the parties as provided in Rule 5 and on nonparties as provided in Rule 4, by **March 19, 2021**; and

(2) if Plaintiff still wants to proceed with his claims against the Estate of Lieutenant Penney, Plaintiff must, **within 90 days of being served with the statement noting death**, serve on [Defendants' counsel] a motion to substitute Kathleen Penney, as Executor of the Estate of Lieutenant Penney, in place of Lieutenant Penney, and then file the motion with the Court along with a certificate of service.  Plaintiff is cautioned that "[i]f the motion is not made within 90 days after service of a statement noting the death, **the action by or against the decedent must be dismissed**." Fed. R. Civ. P. 25(a)(1).

*Id.* at 2-3 (emphases in original).  Defendants' counsel was directed to serve a copy of the March 15 Order on Plaintiff and file proof of service on the docket, *id.* at 3, and Defendants' counsel did so on March 16, 2021, ECF No. 145.

On March 17, 2021, Defendants filed and served upon Plaintiff a document titled "Suggestion of Death for Lt. Penney," which noted Lt. Penney's death "on or about April 11, 2020, during the pendency of this action."  ECF Nos. 146, 147.  As set forth in the March 15 Order, Rule 25(a)(1) states that if a motion for substitution is not made within 90 days after service of a statement noting the death, the action against the decedent *must* be dismissed.  *See* ECF No. 144.  It has been more than a full year since the proper service of Defendants' statement noting Lt. Penney's death, and more than 18 months since the first orders were issued in August 2020 informing Plaintiff of the need to properly serve Mrs. Penny with a motion for substitution and to file proof of service on the docket, yet Plaintiff has still not filed a motion for substitution or properly served such a motion.  Accordingly, Plaintiff's procedural due process claim, which is asserted solely against Lt. Penney, must be dismissed pursuant to Rule 25.

* * * * * * * * * *

Because the Court grants summary judgment on Plaintiff's claims for both the use of excessive force and conspiracy to deprive Plaintiff of his right to be free from the use of excessive force based on Plaintiff's failure to exhaust under the PLRA, and grants summary judgment on Plaintiff's claim for the denial of procedural due process based on Plaintiff's failure to file a motion for substitution under Rule 25, the Court need not, and does not, reach the merits of any of Plaintiff's claims.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (ECF No. 151) is GRANTED, and the case is dismissed.  The Clerk of Court is respectfully directed to enter judgment in favor of Defendants and close the case.

Dated: March 30, 2022
       White Plains, New York

**SO ORDERED.**

_____
ANDREW E. KRAUSE
United States Magistrate Judge

A copy of this Decision and Order has been mailed to the *pro se* Plaintiff by Chambers at his address of record on the docket as of the date of the Decision and Order.